The first argument is United States v. Dawkins. Let me just make sure counsel are here. Mr. Cheney. Yes, your honor. I'm here. You can see and hear the judges okay? I can. Perfect. And Mr. Boone for the government? Yes, your honor. I'm here also. So Mr. Cheney, you've got three minutes for rebuttal that you reserved. We gave you each 12 minutes. So that's nine minutes out of the gate for you, Mr. Cheney. The floor is yours. Thank you, your honor. And may it please the court. My name is Alan Cheney. I represent Christian Dawkins and Murrell Code, the appellants in this matter. Mr. Dawkins and Mr. Code were both improperly charged and then unfairly tried. And because of both of those reasons, this court should reverse their conviction. Although we raised many arguments in our brief, and of course, I'm happy to entertain the court's questions on any of our issues. I'd like to focus on two key areas for my argument time. The first is that the government's theory of prosecution on the bribery counts, even taken on their own terms, do not satisfactorily allege federal funds bribery in this case. The second sort of key issue I'd like to address is the impact of many critical evidentiary and instructional errors on the outcome of this trial. So turning to the first issue, the government's concession that these universities were not in the business of recommending financial advisors for basketball players is and was fatal to their prosecution of Dawkins and Code under section 666. The district court's resolution of this problem was to broadly construe the business of the university to but aside from stretching the bounds of the statute, this also does not solve the problem. In a bribery scheme, criminality turns on the nature of the quo, not the character of the quid. And while it might have been true, counsel, I understood from their brief that they their view is that the universities are in the business of guiding and advising students generally, and that the basketball program fits within that. And they're in the business of advising and guiding students. And Your Honor, it is true that they changed their position on appeal from from their position pre trial, which was to concede that the universities were not in the business of suggesting financial advisors. They point to court in their brief on page 29 and 30 to several instances in the record that they believe supports the way the court just articulated their position to be but if you look at those citations to the record, what it shows is that the university employees testified that they had guidelines surrounding NCAA compliance and ensuring that the interactions between student athletes and would be player agents or financial advisors complied with NCAA rules, but not there was not testimony there was not evidence presented nor did the government ever argue that the assistant coaches as part of their roles as employees of the universities were helping these athletes select any particular financial advisor were helping to select a particular player agent. When you say there's no evidence in the record, I mean, you haven't challenged the issue on sufficiency grounds, right? And Your Honor, I think that because the issue is raised pre trial under the framework of the motion to dismiss and then re raised as a rule 29 issue at trial, the issue is before the court on appeal in either sort of context. It is our position that the bribery charges should never have gone to the jury in the first place. Even from the beginning of trial that the court would have appropriately dismissed the bribery counts on the legal pleadings because of the Let's unpack this a little. If we go back to your argument that the indictment was deficient, I'm hard pressed to know how we could conclude that given that universities are in the business of advising and instructing students and guiding students. If your challenge is sufficiency, then we have to view the evidence in the light most favorable to the government. So I'm not quite sure what error you think we're looking at. I mean, I'm not sure you can conflate the two. So help us out. And Your Honor, I think starting with the first sort of formulation of the court offered, the business of the university cannot under the bribery statute be so broadly construed as to any activity any employee employed by the federally funded entity could ever happen to do. And the district court erred in construing the business of the university so broadly. Why not? Excuse me? Why not? Why? Why would the business of the university not include any action of any employee? Let's assume it's somehow related to their to their to their work. But why not? Your Honor, because I think that any criminal statute must be interpreted with fidelity to its purpose. And we have clear instruction both from Congress and from the United States Supreme Court on what the federal bribery statute was designed. I know. I know. But like in Sabri, right? The Supreme Court said that money is fungible. So presumably, if you had a librarian who was taking bribes to buy certain journals that the university didn't need or even that they did need, that's related to their job duties. Right. So why wouldn't it be? As long as it's job related, I guess I don't see why it wouldn't be quite broad. If you have a small organization, if you have a small town getting federal funds and there are only two employees, then I guess you only have to worry about two people's employee employment duties. But if you have a large university, well, I guess all of them are bound not to take bribes. Right. Two comments on that. The first is that we we argue that it is not the business of the university. We we take the government's position pretrial, which is that the business of the university did not involve recommending a particular financial advisor to the court point on sobriety. I think it's instructive. I think it's important to remember that sobriety was a facial challenge. And the question before the court there was, is there ever a constitutional application of Section 666, which the court found that it clearly was? And so I think it's distinguishable on those grounds. I don't think there's ever been a court ever been a case either before the United States Supreme Court or this court or a relevant circuit court that has tested the limits of connecting both the participants in the conduct charge under the bribery statute. But there is no work. You agree there's no nexus requirement, right? That is what that's what the court said in Stockton under the facial challenge. And that's and you would have a great argument if you were here in the Second Circuit 16 years ago, because under San Pietro and Foley, we used to say there was a nexus requirement right to the federal funds. And then the Supreme Court told us we were wrong. So. So that's not a great development for your theory, it seems, no. And your honor, I think each there are several critical elements within the bribery statute, each of which has been sort of separately tested or whether or not a nexus requirement is should be read into the statute. And with with some exceptions, as pointed out in our briefs, Sunia being one Phillips, which conceitedly the circuit is has questioned its own application of Sovereign Phillips now. But for example, the university is a large entity. Some divisions of it, notably the financial aid department, accepts financial aid or federal aid more than ten thousand dollars. But there is no evidence that the program accepts federal aid, nor would it make sense that it would, given that it is extremely financially and independently wealthy. And so what we have is something more akin to the D.C. Circus opinion in Sunia, where the division of the entity is so attenuated from the rationale, even under Justice Souter's rationale and Sabri that money is fungible and affecting money. One place affects money somewhere else doesn't apply here because there's no there's no impact of these defendants conduct or the assistant coaches conduct on the financial aid, the money that comes in via financial aid to the universe. Sabri said we don't have that impact. Right. Please go ahead. I was. Go ahead. No. Have you finished what you wanted to say in response to Judge Nardini? I believe so. And I believe I'm out of time. All right. Yeah. Quickly. I mean, I have a few questions. We'll go over. We have that luxury. So judge. My concern with the theory you're urging us to to adopt is that it seems to me that the statute is the federal government does not want to give its money to an institution that's corrupt. And to the extent that its employees are engaging in corruption, the fact I mean, I'm not sure you you persuade me that the federal government is only concerned if the corruption pertains to the money it's contributing to the institution. It wants to know that the institution is not corrupt. Why isn't that a more appropriate way to look at this? And your honor, we're we're in fact arguing that the the assistant basketball coaches were not corrupt in this instance or they were not induced to be corrupt by the defendants in this case because the behavior that they were induced to engage in, meaning the recommendation that their athletes signed with Dawkinson Codes, the side employed management was not the business or conduct of the university, was not the business or conduct of the university that was being federally funded. And so. But you see, the problem with that is they would never been in the position to engage in the conduct they engaged in if they were not university employees. So I'm not sure that that persuades either. But Judge Sullivan said he had a number of questions. Anything more on mine before I turn it over back to him? Not at this moment. Oh, thank you, Judge Sullivan. So I wanted to explore with you a little more the sort of narrow reading of in the business. So I teach at a law school. I'm just an adjunct. But there are full time professors there. And presumably they are there in part to guide students to internships and to post graduate employment. If I paid professors to steer me, clerks or steer me, interns, is your view that that would not be covered by 666? Well, I want to be clear that we're taking the position that the government took pretrial. It was their position that the charged conduct steering student athletes to particular financial advisors was not the business of the university. And so as a caveat to the court's hypothetical, the court is taking a more expansive reading up in the business than the government did. And David talks about guiding student athletes through the process of selecting agents, which sounds very similar to guiding students through the process of selecting judicial internships and clerkships. That seems to me that that's in the wheelhouse of a university or law school's business. And your honor, I think one meaningful. I'm sorry. No, I say is there a distinction to be made between my hypothetical and the scenario that's the subject of the indictment? I think one meaningful distinction is that the selection of a player agent or financial advisor is conduct that occurs distinctly after a student athlete has finished his NCAA and is preparing for the NBA draft. There was testimony at trial that the student athletes were actually leaving school once the once the basketball season was over. They were no longer student athletes at all. And they're preparing for the NBA draft. But I knew that it was at this point. I'm sorry to interrupt you. But before they graduate or leave the university, as the case may be, they have to be who their agents are going to be, right? Arguably, yes. And so the concession that the government made just point me to it and articulate it for me, if you would. Yes. And it is in docket number 153 at page 23. And the quote is, although the relevant schools may not be, quote, in the business of they're certainly in the business of running an NCAA compliant athletics program. And it is that second clause that I believe turns the corrupt quid pro quo on its head where they're arguing that by engaging in a corrupt quid, they've induced the the assistant basketball coaches to break NCAA rules. But that's not what the the object of the scheme was. Object of the scheme was to conduct business that is not the business of the university per the government's concession. OK, you know, I don't want to open the door too wide, but there are also, I think, some other topics you wanted to cover as the presider. If it's a complicated case with a lot of issues, certainly we can go over. So unless my colleagues have any objections, I'll give you a few minutes to just talk about some of the other issues that were raised in the brief. I very much appreciate it, Judge. Thank you. The second broad category is the impact of some of the evidentiary and rather than breaking up by type of error, I think it makes sense to break it up by defendant because there are some different errors that impact a different each defendant differently. So starting with Mr. Cote, there are really only two critical moments in the case against Mr. Cote. One is his involvement in the June 20th meeting at the Conrad Hotel in New York City, where he meets with really everybody involved in this case. And that meeting is video and audio recorded. The second is at the end of July, the government's theory that he is on the phone arranging for certain coaches to meet with Dawkins and Seward and DeAngelo in Las Vegas, the so-called Vegas coaches meeting. And there are a number of evidentiary errors that really affected the jury's ability to evaluate the evidence against Mr. Cote at both of those moments in the case. So as it pertains to the June 20th meeting, Mr. Cote was allowed to testify over serious objection and really without any foundation that his understanding was that Mr. Cote was paid two thousand dollars at that meeting in exchange for future services. Now, this is extremely important because the government argued because of Mr. Blaser's testimony that on June 20th, Mr. Cote joined an agreement, joined a conspiracy to pay bribes to college coaches. But when pressed on it, Mr. Blaser explained that his only basis for his understanding was his presence at the meeting. He'd had no prior contact with Mr. Cote. He didn't know Mr. Cote. He had never met or heard of Mr. Cote until June 20th. And so what that means is that the jury, who was able to view the video and view and listen to the conversation from the June 20th meeting, was in exactly the same position as the government's competent or cooperator to evaluate the testimony. It means that under 701, his opinion testimony is that he believed his understanding was that this two thousand dollars was for future services, wasn't helpful to the jury, that it invaded their province, that it allowed the government's cooperator to improperly participate as the 13th juror in this case. And that testimony had a very real impact on the jury's understanding of the evidence on that case. Or excuse me, at that moment. The other big issue from June 20th is. You know, it seems to me that your argument reduces to the fact that because there's a video, this can't be lay opinion testimony because our president recognizes that participants in conversations can sometimes have insights that you really had to be there to appreciate. Now, I'm not sure that it's an abuse of discretion for a district court to think that that that conclusion obtains, even if there's a video, because a video necessarily captures only its particular viewpoint. Am I misunderstanding your argument? I think only slightly, Judge Rogge. And I mean, basically, your lay opinion testimony is not warranted because there's a video. It's not quite as reductionist as that. There's there's really two points I'd like to make on that. The first is that when Marty Blazer is pressed on where where he formed this opinion from, his answer is that he believes it's, quote, everywhere in the transcript. And so if Mr. Blazer, for example, was given the opportunity to defend his opinion and said, well, you just had to be there. It was his body language. It was a wink and a nod that you can't quite see on the video. Then certainly he would be in a position to give the jury information that they did not already have. But that's not his testimony. That was not the foundation laid by the government, not the testimony given by Mr. Blazer. He, by his own terms, is making this opinion based on exactly the information available to the jurors. And because of that, it invaded their province. And because of that, it violated rule 701. The fact that it was on video is simply part of the analysis. Certainly it would have been the case that and the government brings this up in their answer, that some of the testimony, some of the wiretaps involve sort of jargon within the NCAA scene, within basketball team. And we we did not object. We don't object on appeal to the government's ability to solicit testimony explaining what that jargon means. And so the fact that there would be a video or not a video would be immaterial on a question of whether or not they could testify to that. What we're talking about is Mr. Blazer relying on exactly the information available to the jury to draw an inference that it was the jurors a role to draw. All right, why don't we have you reserved three minutes for rebuttal, so we'll we'll hear from you again in a moment, but we'll first hear from Mr. Boone on behalf of the government. For 12 minutes. May it please the court, Robert Boone, I'm an assistant United States attorney on the Southern District of New York. I'll be representing the United States oral argument, and I was one of the prosecutors who represented the United States at the trial below. I want to I want to start with what took up most of John's time, which discussion of Section 666. And I want to make very clear that, first of all, what the defense counsel saying was concession was not a concession when he's referring to a I believe one sentence in a motion regarding the universities not being in the business of recommending advisors. That was clearly taken out of context. I was just responding to defense counsel's arguments that initially were dealing with sort of the business of running a sports firm. And we were just making the point that, like, obviously, a university is not a sports management firm that makes a profit off of recommending advisors. But what is clear and what we argued in our brief and more importantly, what we alleged in our indictment was that the business that the schools are in is running an athletics program and included in that is running a basketball program. And these coaches, as their job, are responsible for running that program, which includes advising players on the court and advising players off the court. And we did allege specifically with respect to agents. And I would just point the court quickly to paragraph three of our indictment. Oh, look, I think it's in the indictment. It seems to be in the indictment. It just didn't seem to be front and center at the trial. It seems to me at the trial, it was all about whether or not it was an NCAA compliant program. And the the instructions from Judge Romney just used an example or a hypothetical of paying a prison guard because the prison is in the business of enforcing its rules. So it seems like really the argument that you made at trial was NCAA compliant program, not advising students. Am I wrong about that? Your Honor, I would say that the government offered a trial evidence of multiple things in terms of what the coaches are responsible for. One was obviously being a coach on the court, advising in terms of plays. There's testimony to this in regards to our two compliance office witnesses, Michael Blanton and Chance Miller. They also talked about how it is, in fact, the coach's responsibility to be mentors off the court and obviously in that capacity, be mentors and advisors on how to be compliant with the NCAA rules. What you argue to the jury in summation was how you would satisfy the in connection with element. Yes. What did you argue the jury? We argue that the coaches committed the crime because they use their influence as the players. That's why they're being bribed. No, I understand that. But how was it in connection with the business of the university? What was your theory to the jury? Our theory was what I what I tried to articulate was that the coaches have responsibility to advise the players both on how to run certain plays and on other things in general, in particular, agents. And that's why there was a lot of testimony at trial about particularly the aspect of agents and the efforts that the universities make to ensure that agents are registered with the university, that they are kept in the loop in terms of their contact with their student athletes. Chance Miller even talked about how the university offers their resources in terms of conference rooms for the agents to meet with the players. And they explained why that was. That was because they wanted to protect the they want to look out for the players. They want to protect the players. They thought it was their responsibility. And they obviously also want to protect the school and make sure that they were in compliance with rules. So, again, what was argued and what the evidence was, was, in fact, that the the coaches and and as employees of the universities, the school's responsibilities included protecting the players, specifically as it came to agents and that conduct. And to be in just to make that was in your summation. I'm sorry, your honor, that was in your summation to the jury. I believe in our summation was reference to the compliance officers testimony and and the importance that was placed on policing for agent conduct. But you say these compliance officers testified, made it abundantly clear that these coaches weren't allowed to be taking this money implicated the NCAA rules, implicated the coaches employment agreements and that the coaches would be fired if these payments were discovered. It seems to be equating payment with the violation that the bribe is the violation. But there has to be more, doesn't there? There is, your honor. And I, I would point the court also to the jury instructions that the judge Ramos actually gave, which made it clear that we are not alleging that violating NCAA rules is a violation. He said very clearly a violation of NCAA rule by itself is not a violation. This is transfer of 1630. He also said the fact that a coach's conduct violates the rules, policies or codes of the NCAA or his employer does not necessarily mean that there was a scheme to defraud transcript 1631. That was consistent with our argument. So, so to the extent that we're talking about the rules, we're talking about the rules because the rules help show intent and the rules help show that the defendants knew what they were doing is wrong. They were aware that they weren't supposed to be doing these things and that these and evidence of that is the fact that there are rules governing this. This is no different than in many public corruption cases where maybe a typical one where it involves a public official taking a bribe who's a state legislature, for example, we may introduce or have testimony about conflict of interest rules. Doing that doesn't now turn the case into whether or not conflict of interest rules is a violation of criminal law. Those rules are offered to help show that intent that the individuals knew that what they were doing was wrong. So that was part of the discussion of part of the reasoning, rather, of sort of why the rules were even mentioned. But as I said, Judge Ramos made it clear that the case wasn't about the rules, except the instructions were that the judge Ramos sort of explained what the government's theory was and says it was that the defendants corruptly attempted to influence or mislead the coaches in connection with some business or transaction of the university, namely the operation and administration of the men's basketball program. That's what he says. He doesn't talk about guiding or advising. He talks about just the operation of the program. And so it's been the concern that operation of the program means following NCAA rules and the NCAA rules then determine whether this is credible or not. Your Honor, I would say, again, what we argued was that, yes, it was that the business was following it was running a basketball program. And inherent is that is what our witnesses testified to, which is that they are also charged with guiding the players both on and off the court. And that includes agent decisions. And that was what was specifically alleged in the indictment. And that was what the testimony showed as Dawkins himself. And this was also in our indictment said that part of the reason they're bribing them or the main reason they're bribing coaches is because they are coaches and it's their job to guide them in terms of agents and in some respects police them in terms of keeping agents away from the players. This was discussed particularly as it relates to Lamont Evans, who's a coach from Oklahoma State and University of South Carolina. So there was the record had evidence of the fact that what we are in terms of what we are talking about with agents was a part of the coach's job and was a part of running a basketball program. But in your view, is running an NCAA compliant program enough? That's the only thing you argue to the jury. That's the only evidence that was presented to the jury. Is that enough to support a conviction under 666? If you're bribing someone to influence them to to to not run it, perhaps. But but again, that that wasn't it wasn't construed so narrowly in the jury instructions, the jury instructions were running a basketball program and and there's no legal significance between including the other additional language about NCAA compliant programs. We argue that based on the fact that Judge Ramos didn't include that in his hypothetical that Judge Ramos gave is about a prison. If somebody paid a bribe to a prison in order in exchange for impermissible conjugal visits, that could be liable under the statute because enforcement of prison rules was a component of the business of the prison. So the instruction sort of focuses everybody on rules and the NCAA rules is what was front and center at this trial. Seems to me there could be a lot of concern that the jury could have convicted on the basis of violations of NCAA rules. Well, as I said earlier, they certainly were instructed directly not to do that. His instructions were very clear that a violation of NCAA rules is not a crime. And he even went on to or is not violation of the rule doesn't necessarily equal a crime. And he went on to talk about how this case is not about whether you agree with the rules or you don't agree with the rules. He went on at length to make sure that the jury were not considering a rules violation to be a dispositive fact in determining defendant's guilt. And in terms of of again, in terms of the rules, what we offered at trial were in terms were the two compliance officers who talked mostly about the employment contracts of the coaches to give a sense of what the university understood their role to be in terms of employees. And they also talked about the fact that what's included is to be a mentor. And as your examples, your hypothetical post-defense counsel sort of suggests at a university, that is part of the job.  And it doesn't stop sort of in the classroom for a professor the same way it doesn't stop on the court for a basketball coach. And particularly when you're dealing with individuals who, as our witnesses talked about, particularly when you're dealing with individuals who have a potential to become professional basketball players and in fact may seek guidance on the process, the universities expect the coaches to comport themselves in a way that helps the student with that process. And that's why they have they went through the procedure they have in place to do that. And that included agreeing to even be in the room with the student athlete when they're when they're meeting with the agent or advisors, even asking questions for them. And again, they explain why why would they do that? They do that because they view it as their role to help the student athlete in addition to helping the school stay in compliance. I see my time is up. Your Honor, I don't know if you want me to address the second point defense counsel made. I have a question about the false exculpatory instruction. Yes, your honor. How you can defend that? I have to say at one point in the trial, Judge Ramos asked the government, are there any false exculpatory statements? And the government responds. This is the trial transcript that 903 at this point in time, I don't believe so. The government doesn't believe that after Mr. Dawkins testifies, then the government says, well, we think that the false exculpatory instruction became necessary through Mr. Dawkins testimony. I mean, a false exculpatory charge is not to be given because a witness took the stand and defended himself. False exculpatory is for statements made out of court to law enforcement officers. There were no false statements to law enforcement, were there? There were no false statements to law enforcement, your honor, but there were statements made pre-arrest that the defense argued were examples, were statements that exculpated him, examples of innocence. But they got a state of mind. You're saying that he made statements to his co-conspirators that were false exculpatories. Why did he need to make a false exculpatory to his co-conspirators? Your honor, that's I mean, I can't speak to sort of why what was in Dawkins mind in doing that. But I think what he I think part of his defense was that a large part of his defense was that he didn't agree to participate in a bribery scheme and that he was forced into it. And when he was on a false exculpatory, here's the standard instruction on false exculpatory. You have heard testimonies from standing. You've heard testimony that the defendant made certain statements outside the courtroom to law enforcement authorities in which he claimed that his conduct was consistent with innocence and not guilt. Clearly, that instruction doesn't apply here, right? It does not, your honor. But but I'm sorry, your honor. Go ahead. I was going to say, it seems to me that you only thought that a false exculpatory instruction was appropriate after he testified at his own time. Your honor, our argument is not that the false exculpatory related to his statement on the stand in terms of his testimony. Our argument was that he referenced prior statements while on the stand and made it clear that he believed those were false or he believed those were actual exculpatory statements. And the actual time those were statements that were already in evidence, right? I believe one, he sought to get evidence in while he was on the stand and one may have been before that was already in evidence. Prior to his testimony, the government took the position that a false exculpatory instruction was not appropriate. You agree with that? Yes, I agree with that. So your view is that a false exculpatory became appropriate because he testified at it became relevant once it was clear that he was going to use his prior statements as exculpatory statements. And if I could direct your attention to the actual charge, the judge gauge was a little bit different than the one your honor's just read. Yeah, I know. Is it a correct charge? Well, I believe that the Fence Council is not arguing that it's incorrect based on the for the reasons that your honor gave. I think their argument is more that it was because it references the defendant's testimony on the stand, not because of what what we're arguing and not because of what your point about the statement being to law enforcement officers, because in the actual charge given, there is no reference to law enforcement officers. Judge Ramos just says now you've heard testimony that the defendant made a statement in which he claimed that his conduct was consistent with innocence and not with guilt. You see, I would think that hurts you rather than helps you, because certainly if Judge Ramos had alluded to the out of court statement adopted in his trial testimony, I would see where you might have an argument. I'm not sure how whether it will persuade, but you would have an argument that what he's really referring to is the out of court statement. But here our concern is that the way it was charged and the way it arose all suggests that it's his testimony. Now, the the charge I would think you might warrant for a falsehood within testimony is the falsus in unum, falsus in, you know, false in part, false in whole. Did the judge give that charge? Sorry, what was the last one, your honor? That if if if you find that testimony is false in part, you can you can reject the part that you find to be false or you can reject the whole as not worthy of your belief. Did he give that charge? I have I have to check. I'm not sure you're on. That seems to me the charge you might be entitled to if you're going to argue that part of testimony is false and part and therefore the whole should be rejected. But I don't see how you're entitled to the false exculpatory charge. I understand your point, your honor, if I could just point out, it might be a question if if that was given, whether there's harmful error or not. Yes, we certainly argue, as we did say in our brief, that in any event, the error was harmless. But but just to respond, you should read the Second Circuit's decision in the United States versus Solano. It's a different instruction, but one could argue it's a less egregious instruction than the one here. Well, your honor, if I could just point out a couple of things, perhaps including. And as you do so, I need you to explain to me why you think it's harmless. But go ahead. Definitely, your honor. So this is part of part of why is it's sort of embedded in my answer. One is I understand your honor's point in terms of a false exculpatory. As a general matter, I would just point to the specific language that was actually used in this charge where we've argued it's very clear he's not referring to Dawkins testimony, as in fact, he says words like statements. There weren't multiple. There weren't multiple. Both defendants didn't testify. So that points to the fact that he wasn't talking about Dawkins testimony. Also doesn't refer to Dawkins testimony. Wait, wait, wait, wait. You've heard testimony that a defendant made a statement in which he claimed that his conduct was consistent with innocence and not with guilt. Yes, a reference to Dawkins, right? Well, there's a there's a your honor. If you look at the last line, it says whether or not the evidence as to a defendant statements. And again, we argue that if you're on if the judge had intended for this to be in reference to Dawkins, his testimony would have been more clear. In addition, the judge did give an instruction regarding Dawkins testimony specifically. And in that charge, he explained how you should treat the testimony like any other witness's testimony. And that's in 1661. So the fact that he is both giving a separate charge as specifically relating to Dawkins testimony and giving a false exculpatory charge suggests that he did not intend for the false exculpatory to also be referring to Dawkins testimony. Otherwise, we think he would not have sort of separated them in the way that they were separated and actually given to the jury where he distinguished when he was talking about Dawkins testimony, as opposed to the more general, as you're all pointed out correctly, the defendant language is used and not and not specifically talking about Dawkins and the fact that he testified. OK, thank you, Mr. Boone. We'll now hear from Mr. Chaney for three minutes of rebuttal. And your honors, my my intent was to discuss the false exculpatory statements because I represent both defendants. I didn't have a chance to get to Mr. Dawkins during my original time. I don't know that I have a tremendous amount to add to the conversation that the court already had with Mr. Boone, except to say that the supposed false exculpatory statements even referenced by the government in their answer brief. One was a recorded conversation between the defendant and the defendant's between Mr. Dawkins and Mr. Code. The other is a recorded conversation between Mr. Dawkins and Mr. D'Angelo. Both of them well predate the filing of charges in this case at a moment in time when Mr. Dawkins had no reason to believe that he was being investigated for a crime. And so the sort of underlying principle for a false exculpatory statement is this notion of consciousness of guilt, this belief that a defendant, if he if he knows that he's guilty, will attempt to sort of sweep evidence under the rug and give a falsely exculpatory version of events to avoid detection. That fundamental premise isn't implicated at the moment when Mr. Dawkins is making comments to Mr. Code, his co-conspirator, or to Mr. D'Angelo, his co-conspirator, who turned out to be an uncalled FBI agent. But even under the government's theory of what constituted the false exculpatory statement, even assuming arguendo their argument that it was not directed at trial testimony, even though I think the plain sort of the plain reading lends itself to the most common understanding would be it is directed at Dawkins' trial testimony. But even if it's not, the predicates did not warrant this charge. And the fact that Mr. Dawkins' defense was almost exclusively built through his testimony, that his credibility, which was properly before the jury, was really the the central sort of defiant characteristic of his defense, made it extremely harmful that the that the court unduly called attention to a potential false false exculpatory statement without any factual predicate to support. Right. But I guess one argument for harmlessness is that the jury clearly was able to acquit Mr. Dawkins when they were inclined to do so. They acquitted him on majority of the charges. Right. And your honor, I actually think that that cuts in the other direction. As courts have noted, when there are split verdicts, it suggests a tightness within the jury. We don't know what's going on in the jury deliberation room. It could have been a split verdict because it was a compromise. It could have been that they all agreed on the services fraud and all agreed on the bribery. But the fact that these defendants were only convicted of three of the 10 charged counts suggests it should suggest to the court that this is a tight case. And that lends toward finding harm in these in these evidentiary and instructional errors, not not way against it. Mr. Cheney, assuming we were to agree that this instruction should not have been given, would the government have been entitled to a falsus in uno falsus in omnibus charge? And if so, how how much difference is there between the two that we would still identify prejudice to your client? And your honor, I'm not familiar with this court's charge on fault. If you find a defendant to if you find a witness to have lied in part, you can reject the part that you find to be false. So you can reject his entire testimony is not worthy of your belief. That standard charge. And your honor, I still think that this would have been error, and I would encourage the court to look not to what could have happened, but what did, in fact, I do understand there's a difference between the charges. I'm just wondering whether it's different enough for us to identify prejudice. I believe that it is. I think that the false exculpatory statement charge ascribes motivation to the falsehood that the other instruction does not necessarily. And so when when that is coming from the bench, the court has to carefully guard that it is an appropriate instruction based on the facts presented to the jury. And that was that's not what occurred here. So I think that even if the other instruction had been given, there's still ample evidence for the court to find that this was a harmful instruction and that it warrants reversal. All right, well, thank you both. We will reserve decision.